IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,     )<br>                              )<br>          Plaintiff,          )<br>                              )<br>     v.                       )<br>                              )<br>PHYLLIS ROWE STEVENS and       )<br>MARLA RANDOLPH STEVENS,        )<br>                              )<br>          Defendant.          ) | CRIMINAL NO. 4:09-cr-176<br><br>GOVERNMENT'S COMBINED<br>SENTENCING MEMORANDUM |

The United States of America, by and through its undersigned counsel, respectfully files its Sentencing Memorandum.

**Introduction**

This Sentencing Memorandum is organized in the following manner: First, it will address disputed issues under the United States Sentencing Guidelines. Second, it will discuss the requests by each defendant for a downward departure based on mental health. Third, it will discuss the factors relevant to sentencing under Title 18, United States Code, Section 3553(a).

Given the prior litigation regarding competency, together with the extensive presentence reports, this Sentencing Memorandum will not address the underlying facts in extensive detail.

The United States anticipates presenting brief testimony from several witnesses, in order to provide the Court with additional context for the sentencing issues discussed below.

**Sentencing Guidelines Issues**

**Two-level adjustment under USSG § 2B1.1(15)(A).** The Probation Office correctly determined that this two-level adjustment applies for Phyllis Stevens, because Phyllis Stevens was "convicted of an offense under 18 U.S.C. § 1030"and "the offense involved an intent to

obtain personal information." Defendants cannot dispute the first element of this, given that Phyllis Stevens pleaded guilty to a violation of Section 1030 (Count 13).

Phyllis Stevens argues, without explanation, that she "did not attempt to obtain personal information as defined by § 2B1.1(b)(15)." (Phyllis Stevens Sentencing Memo., p. 7.) As explained in her Presentence Report, however, an essential step in committing the fraud against her employer was the misuse of the identities of two former salesmen to cause improper "commission" payments to be made into an account that she and Marla Stevens controlled. (Phyllis Stevens PSR ¶ 15.) This included the use of their names, agent codes, and other personal identifying information (e.g., social security numbers).

For these purposes, the term "personal information" is defined as "sensitive or private information involving an identifiable individual (including such information in the possession of third parties)." USSG § 2B1.1, App. Note 1. Several examples are then listed, such as "(A) wills; (B) diaries; (C) private correspondence, including e-mail; (D) financial records; (E) photographs of a sensitive or private nature; or (G) similar information." The government submits that the personal and proprietary information concerning these two individuals, used to facilitate the scheme, fits within this definition.

The argument by Marla Stevens is based on her assertion that she had no knowledge of the details of the scheme, i.e., that it "involved an attempt to obtain personal information." (Marla Stevens Sent. Memo., p. 6.) However, under USSG § 2S1.1(a)(1), the base offense level for money laundering is based upon all relevant conduct (including adjustments) as determined through application of chapter 2 of the Guidelines. *Cf.* USSG § 2S1.1, App. Note 2(C) (explaining limitations on chapter three adjustments). Therefore, if the Court sustains the

Probation Office's to include this adjustment in Phyllis Stevens's case, this same adjustment should be made in Marla Stevens's case.

**Abuse of Position of Trust.** Phyllis Stevens complains that she should not be assessed a two-level enhancement under USSG § 3B1.3, based upon her abuse of a position of trust. (Phyllis Stevens PSR ¶ 42.) She tries to analogize her position (Level 2 Compensation Specialist) as "analogous to a bank teller or hotel clerk." (Phyllis Stevens Sent. Memo., pp. 2-3.)

A position of trust is one "characterized by professional or managerial discretion," and ordinarily applies to employees "are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." USSG § 3B1.3, App. Note. 1. Application of this enhancement does not require "a legally defined duty such as fiduciary duty" but, rather, "turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Thorn*, 317 F.3d 107, 120 (2d Cir. 2003); *see also United States v. Cruz*, 317 F.3d 763, 767 (7th Cir. 2003) ("Employees may hold a position of trust even when they do not occupy upper-level or even supervisory positions.").

This case is similar to the fact pattern presented in *United States v. Tiojanco*, 286 F.3d 1019 (7th Cir. 2002), where the court found that Section 3B1.3 properly applied to a clerk in a hotel's accounts receivable department, who used his position to handle disputed credit card charges by hotel guests in the following manner: "he disguised credit card refunds that went to cards he controlled as refunds destined for hotel guests." *Id.* at 1020. The court rejected his argument that the adjustment didn't apply because he was a "low-level" functionary. *Id.* at 1022. *See also United States v. Moten*, 551 F.3d 763, 767 (8th Cir. 2008) (adjustment applied to "long-time, trusted employee who was responsible--with little if any supervision--for reviewing

3

invoices from grantees and creating purchase orders authorizing payment of [victim organization's] funds.").

As in the above cases, Phyllis Stevens was a long-time employee. She was granted extensive discretion to make adjustments relating to payment of commissions by Aviva to its sales force, and these adjustments were subject to little day-to-day oversight.

### Application of USSG § 5K2.13 (Diminished Capacity)

Each defendant seeks a downward departure for diminished capacity, USSG § 5K2.13. For this guideline to apply, the defendant must show not only that she "committed the offense while suffering from a *significantly* reduced mental capacity," but also that this reduced mental capacity "contributed *substantially* to the commission of the offense." USSG § 5K2.13 (emphasis supplied). Granted, a showing of "but-for" causation is not required, but the allegedly reduced mental capacity must still be established as a "contributing factor in the commission of the offense." *United States v. Ruklick*, 919 F.3d 95, 97 (8th Cir. 1990).

**A.   Phyllis Stevens's alleged Multiple Personality Disorder.**

Phyllis Stevens's argument is premised upon the conclusion of Dr. Drake that she suffers from Dissociative Identity Disorder (DID) (previously known as "Multiple Personality Disorder"). This, in turn, is drawn on the report and testimony previously submitted to the Court on the question of Phyllis Stevens's competency to stand trial.

Initially, as even Dr. Drake was forced to concede, the prevalence of DID is a matter of some continued controversy. (Drake Testimony, page 40.)   To quote one authority:

> Multiple personality (now relabeled in the DSM-IV-TR as "dissociative identity disorder" or DID) is an artifact of bad (or naive) psychotherapy. Although it remains possible that a few cases occur spontaneously, patients with a high capacity for dissociation can have symptoms reinforced if therapists are overly

fascinated with them.

Paris, *Prescriptions for the Mind: A Critical View of Contemporary Psychiatry* (Oxford University Press 2008), at p. 92 (references deleted).  Paris goes on to explain that techniques used in the past by such therapists created the danger that "entirely false memories were being produced under the prompting of therapists with strong preconceptions."  *Id.*, p. 93.  (See also, Olson testimony, pp. 65-66, 86-87.)[1]

As a starting point, the Court should view any claim that Phyllis Stevens was suffering from this disorder with great skepticism.  It is more than plausible that her earlier therapists in Indiana may have been "overly fascinated" with this idea, and it is clear even from the testimony in this Court that she responded much differently to Dr. Drake's interest in her alleged disorder than to Dr. Olson's nonchalant response.  As the Court observed in its order finding Phyllis Stevens competent to stand trial, both Marla and Phyllis Stevens "seemed to direct Dr. Drake to the presence of 'Donnie' during the later phases of Dr. Drake's examination," whereas when Phyllis introduced "Timmy" toward the end of Dr. Olson's evaluation, Dr. Olson simply "continued to address Phyllis as Phyllis and was able to complete the interview without issue." (Court's Docket No. 100, at p. 8.)

It is further significant that there is no indication that she disclosed her alleged multiple personality disorder when she was referred to a counselor because of an issue at work, in approximately 2006.  Although she saw the counselor for a year or two, she did not mention this diagnosis, which Dr. Olson viewed as a "significant omission."  (Olson testimony, page 56.)

---

[1] Dr. Olson was unable to validate or refute the diagnosis and, therefore, accepted it as valid for purposes of his competency evaluation.  (Olson testimony, pp. 66-67.)

In any case, the evidence cannot support the idea that this alleged disorder "*contributed substantially*" to Phyllis Stevens's criminal conduct. To start with, she both maintained employment with Aviva and engaged in a calculated scheme to steal nearly $6 million -- doing so without detection for many years. She managed to create income tax returns and negotiate for the purchase of real estate, all during the course of the scheme to defraud. And when she was confronted with discovery of her fraud, she decisively (if perhaps unwisely) traveled to Indiana and attempted to empty the joint bank account of the remaining proceeds of the scheme -- even going to far as to tell bank officials a series of lies and suggesting that she was planning to leave the country. (Phyllis Stevens PSR, ¶ 19; Criminal Complaint, pp. 5-7.)[2]

### B.   Marla Stevens's claim of diminished mental capacity.

Marla Stevens's claim is based on her claim from her purported fear of going out in public, which she says caused her to commit money laundering because she was "essentially trapped in her suite" at the Bellagio Hotel in Las Vegas. (Marla Stevens Sent. Memo. at 4.) She also claims a bi-polar disorder caused her "to compulsively overspend." (Id.)

The connection between these alleged disorders and the commission of the crime of money laundering is not entirely clear, and the Court is not required to accept these assertions at face value. Indeed, her counselor's statement to an attorney that Marla Stevens suffers from depression and "agoraphobia" is hardly a compelling basis for granting a downward departure. (See Marla Stevens Sent. Memo., Exh. A.) The counselor only saw her after charges were pending, and no detail is provided about the basis for either of these conclusions. Experiencing

---

[2]These observations are consistent with Dr. Olson's analysis that Phyllis Stevens's cognitive status was "in tact," that is, she had appropriate and normal abilities to "problem solve." (Olson testimony, pp. 62-63.)

symptoms of depression after criminal charges were filed against her and her partner is hardly unusual. And the claim of "agoraphobia" (fear of public places), with no stated onset date, seems inconsistent with her other letters of support that described her long involvement in community affairs.

Importantly, Marla Stevens pleaded guilty to a course of conduct that began in 2004, not one that started when she took up residence at the Bellagio. Her crime not only involved the expenditure of millions of dollars on personal items (e.g., over $2.8 million paid to American Express), but also involved the purchase of real estate in Des Moines. (See Plea Agreement, Attachment B, Stipulation of Facts for Marla Stevens.) Relatedly, Marla Stevens cannot persuasively claim to have had only minimal knowledge of the ongoing criminal conduct, from which she substantially benefitted.

**Other Sentencing Arguments**

The balance of Phyllis Stevens's sentencing memorandum is largely an attack on the United States Sentencing Guidelines and an invitation for the Court to completely disregard them. (Phyllis Stevens Sent. Memo., at 4-7.) She conveniently ignores the fact that, by law, the Court must consider the applicable sentencing ranges and policy statements established by the Sentencing Commission, 18 U.S.C. § 3553(a)(4), (5); as well as the Supreme Court's command that courts should consider the guidelines as "the starting point and the initial benchmark" *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also id.* at 46 (recognizing that the guidelines are "the product of careful study based [in many cases] on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). The Supreme Court recognizes that *both* the Sentencing Commission and the sentencing judge are charged with

abiding by the sentencing objectives set forth in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 348 (2007).

Otherwise, both defendants focus on their current, personal circumstances and largely ignore the facts and circumstances of their crimes. But when the Court views not just the current situation of the defendants, but also their "history and characteristics" -- and "the nature and circumstances of the offense" -- a much different story emerges. 18 U.S.C. § 3553(a)(1). Simply stated, it is a tale of longstanding criminal conduct by both defendants, which showed no signs of letting up until the fraud was discovered. The thefts were of ever-increasing amounts, and most of the money was used for the defendants' personal benefit and aspirations.[3] And to the extent that some of the money was paid to the Internal Revenue Service--albeit fraudulently misidentified on tax returns--it is abundantly clear that this was done with the motivation of preventing detection of the fraud.

The Court should impose significant sentences of incarceration in this case, guided by the advisory guidelines. Such sentences are called for "to reflect the seriousness of the offense[s], to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(A).

/

/

/

/

/

---

[3]The fact that the defendants chose to contribute some of the stolen money to causes that they favored is of no consequence. It makes no difference to the victim whether a thief chooses to finance a great cause or use the stolen money for personal gratification.

**Conclusion**

The United States respectfully seeks leave to supplement this Sentencing Memorandum at the hearing scheduled before the Court, through additional comment on the arguments and evidence that may be presented to the Court.

DATED:   January 18, 2011

                                        Respectfully Submitted,

                                        Nicholas A. Klinefeldt
                                        United States Attorney

                                By:   /s/Andrew H. Kahl
                                        Andrew H. Kahl
                                        Assistant U. S. Attorney
                                        U.S. Courthouse Annex
                                        Des Moines, Iowa 50309
                                        Tel: (515) 473-9300
                                        Fax: (515) 4739292
                                        Email: andrew.kahl@usdoj.gov

cc:   William Kutmus, Esq. (via telefax)
       Trevor Hook, Esq. (via telefax

CERTIFICATE OF SERVICE

I hereby certify that on  January 18, 2011, I electronically filed the foregoing with the Clerk of Court using the CM ECF system.  I hereby certify that a copy of this document was served on the parties or attorneys of record by:

____U.S. Mail   _____Fax   _____Hand Delivery

  x  ECF/Electronic filing   ____Other means

UNITED STATES ATTORNEY

By: /s/   A Kahl, AUSA